IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 16, 2013 Session

## ELIZABETH LaFON WESTERN VINSON
## v. JAMES GERALD VINSON

**Direct Appeal from the Chancery Court for Henderson County**
**No. 25171      James F. Butler, Chancellor**

_____

**No. W2012-01378-COA-R3-CV - Filed September 11, 2013**

_____

This is an appeal from a final decree of divorce. Father challenges numerous rulings by the trial court, regarding both parenting issues and financial issues. We affirm in part, as modified, we reverse in part, and we remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, as Modified, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

James Gerald Vinson, Enville, TN, *pro se*
(David W. Camp, Jackson, TN, filed a brief on behalf of Mr. Vinson but was allowed to withdraw as counsel by order of the Court dated February 4, 2013.)

C. Timothy Crocker, Michael A. Carter, J. Noble Grant, III, Ryan L. Hall, Milan, Tennessee, for the appellee, Elizabeth LaFon Western Vinson

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Elizabeth Vinson ("Mother") and James Vinson ("Father") were married in 1997. The parties have two sons, who were born in 1998 and in 2001. Mother filed a complaint for divorce in March of 2011, alleging adultery, among other things. Father filed an answer, denying the allegations of adultery, and he filed a countercomplaint for divorce. Both parties sought to be named primary residential parent of the two sons, who were then ages nine and twelve.

Father is a paramedic, and Mother is a registered nurse. The parties had jointly filed for Chapter 13 bankruptcy during the marriage. As a result, all of their debts – which included two mortgages on the marital residence, credit card bills, medical bills, the notes on their two vehicles, and Father's student loans – had been combined into a single monthly payment of approximately $2,240. Father and Mother had nearly equal amounts withdrawn from their paychecks each month to meet the payment obligation required under the bankruptcy plan. They were still under the bankruptcy plan when the divorce proceedings were filed, and their bankruptcy obligation was scheduled to continue until November 2014.

The parties attended mediation in June 2011 and signed a "Mediated Agreement" that resolved some of the issues involved with the divorce. They agreed that Mother would be named primary residential parent, and they adopted a parenting schedule for the summer of 2011 whereby Father would have parenting time one day every week and one full weekend per month. Each parent also had one week of parenting time designated for their summer vacations. Father was ordered to pay $571 in child support per month "until further Orders of the Court." The parties agreed "to continue to equally divide the Chapter 13 bankruptcy payment." Finally, the parties agreed that Mother would use a $13,000 car wreck settlement that she was scheduled to receive in order to pay "for medical bills and to repay her Father," and Mother was directed to provide an itemized accounting of those expenditures to Father's attorney. All other issues were reserved for trial.

The divorce trial took place in April 2012. The trial court adopted and ratified the Mediated Agreement previously signed by the parties, resolved the remaining issues, and entered a final decree of divorce in May 2012. Specifically, the trial court granted a divorce to Mother on the grounds of adultery, divided the parties' marital estate, required the parties to continue to contribute equally toward the bankruptcy payment, named Mother primary residential parent and adopted her proposed parenting plan, ordered Father to pay child support, declined to award alimony, and ordered Father to pay $5,000 of Mother's attorney's

fees.  Father timely filed a notice of appeal.

## II.  ISSUES PRESENTED

On appeal, Father presents two issues for review, which we quote from his brief:

1.    Did the trial court err when it found that the "mediated agreement" signed by the parties on June 2, 2011 was valid and enforceable and then ratified and confirmed the "mediated agreement" but contradicted the terms of said agreement in it's [sic] final ruling; and

2.    Did the trial court erred [sic] when it awarded partial attorney fees in the amount of $5,000.00 after making a finding that the court is unable to approve [Mother's] request for attorney fees.

Mother seeks an award of attorney's fees on appeal.  For the following reasons, we affirm in part, as modified, we reverse in part, and we remand for further proceedings.

## III.  STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.  *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).  We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness.  *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV.  DISCUSSION

### A.    Consistency with the Mediated Agreement

We will begin by considering Father's assertion that the trial court's final ruling "contradicted" the terms of the Mediated Agreement.  Father argues that "[t]he Final Decree of Divorce, Permanent Parenting Plan and Child Support Worksheet entered in this matter does not properly reflect the terms of the 'Mediated Agreement' or the letter ruling of the

Court."  He contends that there are "inconsistencies" in these documents with regard to several specific rulings on various issues.

### 1.    Provisions of the Parenting Plan

Father challenges several of the trial court's rulings regarding specific details of the parenting plan.  At the outset, we note our agreement with Mother's argument that the trial court was not bound by the parties' Mediated Agreement regarding these issues.  "The trial court should, of course, consider any agreement by the parties as to parenting issues, including the residential parenting schedule. The trial court is not, however, bound by such an agreement, but instead must evaluate whether the agreed arrangement is in the best interest of the children."  *Greer v. Greer*, No. W2009-01587-COA-R3-CV, 2010 WL 3852321, at *7 (Tenn. Ct. App. Sept. 30, 2010) (citing *Tuetken v. Tuetken*, 320 S.W.3d 262 (Tenn. 2010); *Coats v. Coats*, No. M2007-01219-COA-R3-CV, 2008 WL 4560238, at *11 (Tenn. Ct. App. Oct. 8, 2008)).  As we noted in *Greer*,

> While an agreement on parenting issues would ideally reflect the parties'
> considered judgment on the arrangement that would best fit the needs of their
> children, it is also recognized that other factors can come into play in such an
> agreement, such as the original dysfunction in the parties' relationship,
> inequality of resources, reluctance to involve the children in the litigation, or
> even the parties' desire to get the divorce "over with."  For that reason, the
> trial court has broad discretion to determine an appropriate parenting plan in
> light of the evidence adduced at a hearing and the best interest of the children,
> even where the parties have reached an agreement on such issues.

*Id.* at *7.  Simply put, "parents cannot bind the court with an agreement affecting the best interest of their children," so the trial court was not bound to approve the mediated parenting plan. *See Fletcher v. Fletcher*, No. M2010-01777-COA-R3-CV, 2011 WL 4447903, at *9 (Tenn. Ct. App. W.S. Sept. 26, 2011) (citing *Tuetken*, 320 S.W.3d at 272).

In this case, however, the trial court considered the children's best interest and ultimately *did* adopt and approve the parties' Mediated Agreement.[1]  In the final decree of

---

[1]  Prior to trial, the judge made clear that he recognized his responsibility to consider the parenting issues and that he did not intend to simply rubber-stamp the Mediated Agreement:

> The Court finds that the 6/2/11 Mediated Agreement as signed by all parties and counsel is
> a valid agreement. The parts having to do with the children are always subject to the
> approval of The Court. The Court cannot abandon its responsibility to make sure that we

(continued...)

divorce, the trial court stated that it "ratified and affirmed" the Mediated Agreement. The decree further provided that the trial court approved Mother's proposed parenting plan, but that Mother's proposed parenting plan "shall comply with the Mediated Agreement unless the parties agree otherwise by signing a different plan." Therefore, we will consider Father's arguments regarding the alleged inconsistencies between the Mediated Agreement and the parenting plan in order to determine whether they "comply," as the trial court intended.[2]

### a. Father's Weeknight Parenting Time

The Mediated Agreement provided that Father would have parenting time with the children "during Summer of 2011 from 6:00 p.m. on Friday until 6:00 p.m. on Sunday one weekend a month when Father is off work and one day every week from 9:00 a.m. until the following day at 9:00 a.m. In the event that Mother is working, Father shall keep the minor children until 6:00 p.m." The parenting plan that was ultimately adopted by the trial court provided that Father would have parenting time "from Friday at 6:00 p.m. to Sunday at 6:00 p.m. one weekend per month . . . . In addition, father shall have parenting time with their children one night each week." Father's brief on appeal presents the following argument challenging the trial court's decision with regard to weeknight parenting time, which we quote in full:

> In the Permanent Parenting Plan attached to the Final Decree of Divorce the mother did not include specific times within the day to day schedule but only states "Father shall have parenting time with the children one night each week." In the testimony at trial Mother acknowledged her Proposed Parenting Plan which was approved by the Trial Court differed from the Mediated Agreement in this respect.

Thus, we interpret the basis of Father's argument to be that the trial court should have included specific time parameters for his weeknight parenting time in order to be consistent with the Mediated Agreement.

We recognize that the trial court ordered the permanent parenting plan to "comply" with the Mediated Agreement, but we find no conflict between the two as it relates to this

---

[1](...continued)
have an adequate Parenting Plan. So, The Court will, of course, review that, and the parties are free to put on additional proof about that if this – if they disagree with what they've agreed to here.

[2] Both the Mediated Agreement and the final decree provided that Mother would be named primary residential parent, and Father does not challenge this ruling on appeal.

issue. Because the Mediated Agreement only addressed the summer of 2011, the trial court's permanent parenting plan, which obviously involves a different time period, does not contradict the terms of the Mediated Agreement. In fact, it was impossible for the trial court to continue the 9 a.m. to 9 a.m. hourly schedule for weekday visitation once the children started school, so the court was necessarily required to adopt a different schedule than that followed during the summer of 2011. In fashioning an appropriate, year-round parenting schedule for the children, beyond the summer of 2011, the trial court was not limited to the terms agreed upon by the parties in the past.

Considering the parties' circumstances, we find no abuse of the trial courts' discretion in deciding not to specify a particular weeknight, or particular hours, for Father's weekly parenting time. At trial, Father testified that his work schedule as a paramedic consists of 24-hour shifts, and he works 24 hours "on" and 48 hours "off." Basically, he explained that he works every third day. Father testified that his work schedule is developed by his supervisor two months ahead of time, and that he has no input into formulating the schedule. Mother testified that Father also has one weekend off per month, but that the particular weekend "rotates," so "it's very unpredictable." The proposed parenting plan submitted by Father contained absolutely no specificity, as it simply stated, "Father is working a schedule of one day every three days. The Father shall have the children on his days off." At trial, Mother testified that the parties could cooperate to make decisions regarding the children, despite the animosity between them. Thus, we find no abuse of the trial court's discretion with regard to the lack of specificity in the parenting schedule.

Although not specifically mentioned in his brief, we note that during oral argument before this Court, Father appeared pro se and argued that he should have been awarded more parenting time with the children. He contended that one day per week was "not acceptable" for a parent. Father noted that his oldest son, who was 13 years old, met with the trial judge in chambers during the divorce proceedings and expressed his desire to have more parenting time with Father. We note the stated preference of the child, but the trial judge certainly heard and considered the child's statements, and all of the other evidence in this case, before it designed this particular parenting schedule. Father's irregular work schedule makes it difficult to fashion a workable arrangement. He acknowledged the difficulties it can present during the divorce trial when he conceded that he only attended one of his son's basketball games during 2011 due to work obligations. Father had not been to a single parent-teacher conference and did not know the name of either of his sons' teachers. Requiring the children to schedule their lives around Father's unpredictable work schedule would be a heavy burden. Courts must be mindful of the practical effect of a complex parenting schedule and its impact on the children's daily lives:

A parenting schedule that requires the child to shuttle frequently between

households, whether implemented to accommodate parental work schedules or in order to neatly divide the child's time between the parents, is most onerous for the child who bears the brunt of the parents' divorce. The child must be ever mindful to have with her necessary school books, supplies, clothing, or even toys or sports equipment, and must be vigilant to be ready to gather her belongings at the appointed time for transportation to the other parent's house. Even mundane things such as making a play date with a friend or scheduling an after-school activity require the child to ascertain in which parent's home she will be or who is picking her up and when. All children must tolerate some of these considerations, and a child of divorced parents must necessarily have a more complicated schedule than children from intact homes, if the child is to have a meaningful relationship with both parents. But a schedule that mandates such frequent back-and-forth, whether to accommodate a parent's work schedule or not, gives the child little opportunity to have a sense of belonging, and time to simply be home becomes a luxury.

Thus, while virtually all divorced parents must work outside the home, and some parents must work atypical hours, it is not punishment to the parent to consider the effect of her work schedule on the child. Rather, it is the court's job to ensure that the everyday quality of the child's life is not sacrificed to meet the parents' needs or desires. Consideration of how "child-friendly" each parent's schedule must necessarily be part of that determination. "[T]he child's best interest [is] the paramount consideration. It is the polestar, the *alpha and omega*." *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983) (emphasis in original).

*Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *27-28 (Tenn. Ct. App. July 14, 2011). Considering the parties' circumstances and the difficulty of formulating a stable schedule, we find no abuse of the trial court's discretion in deciding that Father would have parenting time one weekend per month and one night per week.[3]

### b. Summer Vacation

Father acknowledges that "the Mediated Agreement does not specify summer schedule beyond the year of 2011." Consequently, there is no inconsistency between the

---

[3] We also note that when Father appeared pro se at oral argument, he discussed various ways in which Mother had allegedly failed to comply with the final decree of divorce since it was entered. As an appellate court, we are not in a position to consider those assertions, so we have not discussed them in this opinion. Father's recourse for such issues must be pursued in the trial court.

Mediated Agreement and the parenting plan with respect to a summer schedule. However, Father argues that the trial court erred in simply providing that each parent would have parenting time for one full week during June and during July. He claims that "[a] more specific schedule should have been provided" and "would have been more consistent with the parties['] intent." Again, considering Father's work schedule, and the fact that the trial court required the parties to provide notice of the selected summer dates by May 1 of each year, we find no abuse of discretion in the trial court's decision.

### c. Thanksgiving Break Schedule

The Mediated Agreement did not address Thanksgiving break, and therefore, the permanent parenting plan does not conflict with the Mediated Agreement with respect to this issue. Nevertheless, Father points out an internal conflict in the permanent parenting plan's provision regarding the Thanksgiving schedule. The parenting plan provides:

> Thanksgiving Day and Friday: Mother shall have their children for Period one from the time school is out until 3:00 p.m. on Thanksgiving Day in *even* years. Father shall have their children for Period two from 3:00 p.m. Thanksgiving Day until the regular exchange time on Friday. The parties shall alternate Period one and Period two with the Mother having Period one in *odd* years and the Father having Period one in even years.

(Emphasis added). There is a clear conflict between these two parts of the same provision. Father argues on appeal that this error effectively gives Mother Period one every year. Because the trial court unequivocally stated that the parties shall alternate periods, and the even/odd conflict appears to be an unintended typographical error, we hold that the parties must alternate periods during Thanksgiving break from year to year. The final decree of divorce was entered in May 2012, so only one Thanksgiving has passed since the decree was entered. The parent who had the children during Period one in 2012 shall have them during Period two in 2013, and the parties shall continue to alternate thereafter.

### d. Christmas Break Schedule

There is no conflict between the Mediated Agreement and the parenting plan with regard to the Christmas break schedule, as the Mediated Agreement only addressed the summer of 2011. However, Father argues that the parenting plan's schedule for Christmas break is, basically, unfair, because it divides the Christmas break into two periods and provides that Mother will have Period one every year, rather than alternating. As a result, Father will have the children every year from Christmas Day at 2 p.m. until the evening before school resumes, but he will never have them on Christmas Eve or Christmas morning.

Father contends that the parties should alternate periods.

Essentially the same similar argument was made in **Smith v. Smith**, No. M2006-01390-COA-R3-CV, 2010 WL 288758, at *9 (Tenn. Ct. App. Jan. 25, 2010), where the trial court entered a parenting plan that divided the Christmas break into two periods, and the mother was to have the children for the first period every year. On appeal, the father argued that "it is not in the best interests of the children that they never be allowed to spend Christmas morning with their father." *Id.* at *9. The Court of Appeals declined to modify the trial court's decision, stating, "the kind of modification Father would have this court make amounts to the 'tweaking' we are not allowed to do." *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). To clarify, in the **Eldridge** case referenced by the Court, the Tennessee Supreme Court provided the following explanation regarding the role of an appellate court in these matters:

> It is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court. Appellate courts correct errors. When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See State v. Franklin,* 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf. State v. Pappas,* 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); *Bradford v. Bradford,* 51 Tenn. App. 101, 364 S.W.2d 509, 512-13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g., State ex. rel Vaughn v. Kaatrude,* 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Eldridge*, 42 S.W.3d at 88. Keeping these principles in mind, we cannot say that the trial court abused its discretion in fashioning the parenting schedule for Christmas break. During the divorce trial, Mother was asked why she thought it was appropriate for her to have the children every year during the first period of Christmas break, and Mother replied, "He normally does not ask for them during that time. They don't have a get-together on

Christmas." Father did not dispute this contention during his testimony. Having heard the evidence, the trial court formulated a plan that it determined was in the children's best interest. It is not our role to "tweak" the parenting plan to attempt to achieve a more reasonable result.

### e.    Paramour provision

Again, the Mediated Agreement does not mention anything relevant to paramours, so it is not inconsistent with the permanent parenting plan. Nevertheless, in the section of Father's brief regarding the issue of whether the documents are consistent, Father argues that the trial court erred in adopting a parenting plan that contains a provision precluding him from having a paramour spend the night in the presence of the children. Father was living with his parents at the time of the divorce trial, but he points out that Mother testified that she anticipated that he would move in with his girlfriend. Despite this recognition, Mother's proposed parenting plan prohibited the parties from having a paramour spend the night in the presence of the children. Father did not raise the issue during trial. In fact, the parenting plan proposed by Father contained the same prohibition. It stated, "Any paramour of either parent to whom a parent is not legally married is not to spend the night in the presence of or in the same residence with the minor child of the parties." Therefore, Father is not entitled to relief with regard to this issue. *See* ***Dye v. Witco Corp.***, 216 S.W.3d 317, 321 (Tenn. 2007) (quoting *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996)) ("issues raised for the first time on appeal are waived").

### f.    Child Support

Next, Father challenges the trial court's decision to require him to pay $694 per month in child support. Father argues that this ruling conflicts with the Mediated Agreement, which provided that he would pay $571 per month "until further Orders of the Court."

In Tennessee, parents are legally obligated to support their minor children in a manner commensurate with their own means and station in life. ***Richardson v. Spanos***, 189 S.W.3d 720, 724 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 34-1-102(a); *Wade v. Wade*, 115 S.W.3d 917, 920 (Tenn. Ct. App. 2002)). Since 1984, "the process and criteria for ascertaining a parent's child support obligation has been governed by Child Support Guidelines promulgated by the Tennessee Department of Human Services" in accordance with Tennessee Code Annotated section 36-5-101. *Id.* at 724-25. The Child Support Guidelines, when properly applied, create a rebuttable presumption of the proper award of child support. ***Taylor v. Fezell***, 158 S.W.3d 352, 357 (Tenn. 2005); *see also* Tenn. Code Ann. § 36-5-101(e)(1)(A). "Although the trial courts retain an element of discretion to deviate from the presumptive amounts, such discretionary decisions must take into

consideration the applicable law and the relevant facts." *Reeder v. Reeder*, 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). When a trial court decides it is appropriate to deviate from the presumptive amount of child support, it must "make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child or children, or the equity between the parties." Tenn. Code Ann. § 36-5-101(e)(1)(A). In addition, the court's findings must state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines. *Id.*

Parties may agree to a child support obligation that "exceeds the amount payable directly to an obligee parent under the Guidelines and to a method of calculating child support that differs from the mechanism contemplated by the Guidelines as long as the resulting child support meets or exceeds the amount mandated under the Guidelines." *Kesser v. Kesser*, 201 S.W.3d 636, 642 (Tenn. 2006). Therefore, trial courts must find that the parties' agreement meets the minimum child support obligation provided under the Guidelines. *Id.* The court must use the Child Support Guidelines to review the adequacy of the agreed-upon child support provision. *Brown v. Brown*, No. E2011-00421-COA-R3-CV, 2012 WL 1267872, at *10 (Tenn. Ct. App. Apr. 13, 2012) (citing *Berryhill v. Rhodes*, 21 S.W.3d 188, 191 n.7 (Tenn. 2000)).

In this case, there is nothing in the record to explain how the parties reached the figure of $571 when they agreed that Father would pay that amount of child support in the Mediated Agreement. Therefore, we cannot discern whether that amount was the presumptive amount owed by Father based upon the parties' incomes. The mediation took place in June 2011. The divorce decree entered in May 2012 increased Father's child support obligation to $694. At first blush, one would presume that the trial court decided that $571 was insufficient to meet Father's minimum child support obligation according to the Guidelines. We would not have questioned the trial court's decision if it had simply calculated Father's child support obligation based on the parties' incomes and information at or near the time of trial in 2012, and increased his obligation accordingly. However, that is not what happened. The trial court set Father's child support obligation by using Mother's gross income according to her *2011* W-2 forms, and Father's gross income according to his *2010* W-2 forms, with no explanation for the discrepancy.[4]

We recognize that Father's income had decreased between 2010 and the time of trial. In 2010, when the parties were still married, Father worked full-time for the ambulance service in Hardin County, and part-time for the ambulance service in Decatur County. He

---

[4] The trial court's child support calculation listed a 2011 gross income for Mother of $67,099.

also earned a relatively small amount of income through a part-time teaching job with the Memphis Med. According to Father's 2010 W-2 forms,[5] the income attributable to Father's full-time job at Hardin County was $39,134, and Father's total gross income that year, from all three jobs, was around $57,522. On January 1, 2011, while the parties were separated, Father voluntarily left his full-time position in Hardin County to work full-time for the ambulance service in Decatur County. Father's paramour also worked for the ambulance service in Decatur County, but he testified that he changed jobs because his previous supervisor did not approve of his part-time teaching job with the Med. We note that in Father's counter-complaint for divorce, he asserted that he changed jobs in order to spend more time with the children. At trial, Mother testified that Father had told her that he was not going to work so much because he did not intend to pay her a large amount of child support. In any event, Father testified that he started out making the same amount of money at Decatur County that he made at Hardin County. Mother filed for divorce shortly after Father's job change, in March 2011.

In 2011, Father's wages from the Decatur County job were $44,129, according to his W-2 forms. This was more than he earned from Hardin County in 2010 ($39,134) but less than his three-job total from 2010 ($57,522). At trial, Father testified that when he initially went to work for the ambulance service in Decatur County, he was employed by the local hospital and making the same amount of money that he made at Hardin County, but on October 1, 2011, the county took over the ambulance service and cut employees' wages from $16 per hour to $13 per hour. Accordingly, he testified that his 2012 income from Decatur County would be even less than the $44,129 reflected on his 2011 W-2. Father testified that the $3 per hour pay cut had significantly reduced his income and his ability to pay his bills. Father also testified that he no longer held the part-time teaching position because the Med had hired someone to fill the position full-time. Father acknowledged at trial that he was not working as many hours as he had in 2010, but, he pointed out, he was still working a full-time job.[6] Father also claimed that if he worked additional hours it would impose on his

_____

[5] During the divorce trial, there was some inconsistency among the parties and their attorneys with regard to whether they utilized the parties' income information as listed in Box 1 of the parties' W-2 forms or the amounts listed in Box 3 or Box 5. There was no explanation for the discrepancy. For purposes of comparison in this opinion, we have used the amounts listed in Box 5, as the trial court did. However, nothing contained herein should be read as precluding the use of different figures if the trial court determines on remand that a different amount accurately reflects the parties' gross incomes for purposes of calculating child support. *See, e.g.*, Robert Vance, "The W-2 as Roadmap for Tennessee Child Support Guideline Income," *Family Practice, The Newsletter for the Family Law Section of the Tennessee Bar Association* (August 2002) (discussing the various boxes and which should be used in different circumstances).

[6] It is not clear from the record whether Father had regularly worked multiple jobs in the past, or if he did so only during 2010. He testified that he began working at Decatur County EMS part-time in July

(continued...)

opportunities to see his children. He denied telling Mother that he was not going to work as much so that he would pay less child support.

On appeal, Mother argues that the trial court was correct to utilize Father's 2010 income figures because they accurately reflected his true earning capacity. However, the trial court did not make any finding that Father was voluntarily underemployed. In fact, the only finding by the trial court relevant to this issue was in its letter ruling, where the court said, "After Husband left the Hardin County EMS job and went to Decatur County Hospital where his girlfriend works, he suffered a $3.00 per hour pay cut *which was unexpected*." (Emphasis added). Despite this finding, the trial court used Father's 2010 income total from all three jobs – $57,522 – in order to calculate his child support obligation. Father's 2011 income was only $44,129, and he testified that he was making even less at the time of trial in 2012. Father produced his paycheck stubs from the past several months, which indicated that he was working, during each two-week pay period, at least 80 hours of work at $13 per hour, in addition to several hours of overtime each week. His net pay for a two-week period was roughly $1,000. Father testified that his average "bring home" pay in a month was $2,000. Despite this evidence, the trial court's child support worksheet lists his monthly gross income as $4,793.53 (based on his 2010 income figures), and it orders Father to pay $694 per month in child support.

Obviously, the trial court was not bound to enforce the parties' Mediated Agreement with regard to child support if the court determined that $571 was not sufficient to meet Father's minimum child support obligation owed according to the child support guidelines. And, in calculating the amount owed by Father, the trial court could impute additional income to Father *if* it determined that he was voluntarily underemployed. The Guidelines specifically provide that "[i]mputing additional gross income to a parent is appropriate in the following situations: (I) If a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed[.]" **Tenn. Comp. R. & Regs. 1240-02-04- .04(3)(a)(2)(i).** Thus, in order "to trigger this portion of the child support guidelines and '[t]o calculate a child support award based on earning capacity rather than actual net income, *there must be a threshold finding that the obligor parent is willfully and voluntarily underemployed or unemployed*.'" ***Goodman v. Goodman***, No. W2011-01971-COA-R3-CV, 2012 WL 1605164, at *4 (Tenn. Ct. App. May 7, 2012) (quoting *Marcus v. Marcus*, No. 02A01-9611-CV-00286, 1998 WL 29645, at *3 (Tenn. Ct. App. Jan. 28, 1998) (emphasis in ***Goodman***); see also *Kendle v. Kendle*, No. M2010-00757-COA-R3CV, 2011 WL 1642503, at *3 (Tenn. Ct. App. Apr. 28, 2011) (citing Tenn. Comp. R. & Regs.

---

[6](...continued)
of 2010, so it appears that he did not work at these particular jobs in previous years. The only other testimony about Father's past employment was that he had been a paramedic for 12 years.

1240–2–4–.04(3)(a)(2)(i)(I)). The purpose of determining whether a parent is willfully or voluntarily underemployed is "to ascertain the reasons for the parent's occupational choices, and to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and to determine whether such choices benefit the children." **Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii).** The Guidelines provide that "[o]nce a parent [] has been found to be willfully and/or voluntarily under or unemployed, additional income can be allocated to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity, and the increased amount shall be used for child support calculation purposes." **Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II).** Here, however, the trial court did not make a finding that Father was willfully and/or voluntarily underemployed. The only relevant factual finding by the trial court was that Father's $3 per hour pay cut was "unexpected."[7] "The Guidelines do not presume that any parent is willfully and/or voluntarily under or unemployed." **Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii).** We have reversed child support awards in previous cases when trial courts have imputed income to a parent but failed to make a finding of voluntary underemployment. *See, e.g. Via v. Via*, No. M2006-02002-COA-R3-CV, 2007 WL 2198187, at *6 (Tenn. Ct. App. July 23, 2007) ("The trial court abused its discretion in imputing income to Wife based upon no finding of willful and/or voluntary unemployment or underemployment."); *Kelley v. Kelley*, No. M2004-01202-COA-R3-CV, 2005 WL 2240964, at *4 (Tenn. Ct. App. W.S. Sept. 15, 2005) ("In the absence of a written finding that Mr. Kelley was willfully underemployed, or that a deviation from the [Guidelines] was otherwise warranted, under T.C.A. § 36-5-101(e)(1)(A), the trial court is obligated to base the child support award upon Mr. Kelley's actual income at the time of the hearing.") In *Goodman*, 2012 WL 1605164, at *6, this Court decided that when a trial court calculates child support based upon an alleged earning capacity, but fails to make a specific finding of voluntary underemployment, the appropriate course is to "reverse the judgment of the trial court basing Father's child support obligation on his alleged earning capacity and remand for a determination of Father's child support obligation based on his actual income." Therefore, we reverse the trial court's decision setting child support at $694 and remand for further proceedings to include an appropriate calculation of child support based upon Father's actual income. Father shall continue to pay $694 per month pending remand.

### g. The Children's Counselor

---

[7] We note that in the section of the trial court's letter ruling entitled "Alimony," the court discussed Father's ability to pay alimony. In that context, the court made the remark that "Husband has regularly worked a second job in the past, and has the time and ability to do so," but the court nevertheless concluded that Father was not financially able to pay alimony. This isolated remark, made for the purposes of the alimony analysis, is not sufficient to support the trial court's deviation from the Child Support Guidelines in this case.

The parenting plan contained a provision that stated, "Parenting time of each parent shall be subject to modification based upon the recommendations of the counselor for the children, Rodney Williams." Father argues that this was an impermissible delegation of the trial court's authority to determine what is in the children's best interest. He points out that the counselor was no longer seeing the children by the time of the divorce trial and that the counselor did not testify during the proceedings.

The children saw the counselor for a short time period after a physical altercation between Father and the oldest son. Father testified that the oldest son was cursing at him in the back seat of the truck, and that Father attempted to "grab" onto him, and when he did, he ripped the child's jacket. The children and Father had supervised visits for about a month thereafter. At trial, Mother acknowledged that the counseling and supervised visitation had ended and that "things are better." On appeal, she contends that Father's argument challenging this provision of the parenting plan is "moot" because the children no longer receive counseling services from Mr. Williams.

"[T]he trial judge, and the trial judge alone, has the solemn duty to determine whether a given parenting arrangement is in the best interest of a child in his charge," and this duty cannot be delegated to a chosen arbitrator, or to the parties' lawyers. *Fletcher*, 2011 WL 4447903, at *8-10. We find no basis to justify the provision at issue and hereby modify the parenting plan to delete the provision in its entirety.

## 2.   Financial Matters

### a.   The Bankruptcy Payment

Having considered all of the rulings regarding parenting issues that Father alleged were inconsistent with the Mediated Agreement, we now turn to financial issues. The Mediated Agreement provided that the parties would "continue to equally divide the Chapter 13 bankruptcy payment." The divorce decree likewise required the parties to continue to equally share the bankruptcy payment. Therefore, there is no inconsistency between the two.

The effect of the trial court's ruling was that both Father and Mother would continue to pay roughly $1100 per month for approximately two years, until the bankruptcy plan ends in November 2014. At the time of the divorce trial, Mother and the children were residing in the marital residence, which was located next door to Mother's parents' home, and Mother's parents helped her with child care. The trial court's letter ruling provided, with regard to the bankruptcy payment:

The Chapter 13 plan includes not only the two mortgages, but Wife's vehicle,

-15-

some medical bills, Husband's school loans, and marital credit card debt. Husband's vehicle has been paid through the bankruptcy and now released. It is equitable that Husband continue to pay one half of the bankruptcy payment as part of the equitable allocation of marital debt in the nature of support for the Wife. This allocation also allows Wife more of her income for her and the children's support.[8]

Additionally, the final decree stated:

The Chapter 13 plan includes the two mortgages and the parties shall continue to pay one-half of the Chapter 13 payment, or Defendant may pay an equivalent amount of money to Plaintiff. It is the Court's intention that Defendant's obligation shall be a non-dischargeable debt in bankruptcy. In the event Husband is successful in discharging this obligation in bankruptcy, in spite of this Court's intentions, the Court reserves the jurisdiction to set or modify alimony.

At trial, Father testified that it was his desire to convert to a Chapter 7 bankruptcy plan. On appeal, he claims that he cannot afford to continue to pay $1104 per month for the bankruptcy payment, and he argues that the trial court's ruling impermissibly "required" him to continue in the Chapter 13 plan. We disagree. During the divorce trial, Father's attorney specifically asked the trial judge if he was finding or ruling that Father could not convert to a Chapter 7 bankruptcy proceeding, to which the judge responded, "No. I didn't -- I didn't find that. I don't think I've got that power." The final decree of divorce required Father to pay "one-half of the Chapter 13 payment, *or Defendant may pay an equivalent amount of money to Plaintiff*." (Emphasis added). Consequently, we find no merit in Father's assertion that the trial court basically "instructed" him not to convert to a Chapter 7 bankruptcy filing.

Father also argues that the trial court erred in reserving jurisdiction to set alimony in the event that Father obtained a discharge of the $1104 per month obligation ordered by the trial court. "Although it is not often done, the trial court may, in its discretion, declare the parties divorced and reserve the issue of alimony to be decided at a later time." *Walton v. Walton*, No. W2004-02474-COA-R3-CV, 2005 WL 1922565, at *6 n.2 (Tenn. Ct. App. Aug. 10, 2005) (citing *Robinette v. Robinette*, 726 S.W.2d 524, 525 (Tenn. Ct. App. 1986)).[9] "It

___

[8] The order provided that Mother would assume the two mortgage loans after the bankruptcy payments end in 2014.

[9] The *Robinette* Court recognized that the general rule followed in Tennessee is that "where a decree
(continued...)

-16-

has been recognized, however, that reserving the issue of alimony should be done 'sparingly' and only 'in unique factual situations.'" *Id.* (quoting *Perry v. Perry*, No. W2001-01350-COA-R3-CV, 2002 WL 1751407, at \*6 (Tenn. Ct. App. Mar. 21, 2002) (Farmer, J., concurring in part and dissenting in part)); *see also Isbell v. Isbell*, No. 02A01-9708-CH-00188, 1999 WL 455429, at \*5 (Tenn. Ct. App. July 2, 1999) ("Reserving the issue of alimony in the final judgment is a remedy that is sparingly used in cases involving unique circumstances."). In *Walton*, 2005 WL 1922565, at \*2, for example, the trial court reserved jurisdiction to evaluate and review an award of alimony after 18 months while the wife sought disability benefits. In *Robinette*, 726 S.W.2d at 525, the court reserved judgment on the issue of alimony in light of the wife's health condition, which was likely to deteriorate. In *Lawson v. Lawson*, No. 03A01-9709-CH-00406, 1998 WL 251757, at \*3 (Tenn. Ct. App. E.S. May 20, 1998), the Court held that the issue of alimony should be reserved for a future determination in the event that the wife's employment with the husband's family's business was terminated without cause after the divorce.

In *Isbell*, 1999 WL 455429, at \*5, we found that although the wife had "reason to be concerned" about the possibility of being laid off from her job, her circumstances were "not as compelling as those in *Lawson*, and that the trial court did not abuse its discretion in declining to award alimony or in failing to reserve the issue of alimony in the final judgment." We emphasized that reserving the issue of alimony in the final judgment is "a remedy that is sparingly used in cases involving unique circumstances." *Id.*

To recap, in this case, most of the parties' marital debts were already combined into a single Chapter 13 bankruptcy payment, so the trial court was not able to order the parties to pay specific marital debts. Instead, it ordered them to each continue paying one-half of the bankruptcy payment. Father already had an appointment with a lawyer for the following week to explore the possibility of converting the parties' Chapter 13 filing to a Chapter 7 filing. The trial court concluded that alimony was inappropriate at the time of trial because Father could not afford to pay it. But it decided that it would reserve jurisdiction to set alimony in the event that Father was successful in discharging his Chapter 13 obligation, which the trial court had ordered him to pay. We find that these circumstances are

---

[9](...continued)
of absolute divorce is final and the decree does not award alimony, the spouse may not be awarded alimony at any subsequent time." 726 S.W.2d at 525 (citing *Davenport v. Davenport*, 178 Tenn. 517, 160 S.W.2d 406 (1942); *Darby v. Darby*, 152 Tenn. 287, 277 S.W. 894 (1925)). However, "[t]he general and near universal exception to this rule is that alimony may be awarded after a decree of absolute divorce has become final where the right is afforded by statute or reserved in the divorce decree." *Id.* (citing 27A C.J.S. *Divorce* § 231b., 24 Am.Jur.2d *Divorce and Separation* § 689 (1983)).

compelling enough to justify the exceptional remedy employed by the trial court.[10] The trial court could not individually address the parties' marital debts because they were tied up in the bankruptcy proceedings, and the court could not conclusively determine whether Father would convert his bankruptcy filing and possibly avert paying the $1104 ordered by the trial court. Therefore, this case involves "unique circumstances" like those encountered in *Lawson*, *Robinette*, and *Walton*, and we find no abuse of discretion in the trial court's decision to reserve the issue of alimony in the event that Husband is successful in having his previously ordered obligation discharged in bankruptcy.

### b. Mother's Car Accident Settlement

Mother received approximately $13,000 during the divorce proceedings due to a settlement from a car accident case. The parties' Mediated Agreement addressed the settlement with the following language:

> That Elizabeth Vinson has disclosed to James Vinson that she will receive approximately $13,000 from a car wreck settlement and she shall use those funds for medical bills and to repay her Father. That counsel for Elizabeth Vinson shall submit an itemized accounting of the expenditures of those funds to counsel for James Vinson.

It is undisputed that Mother never provided the itemized accounting to Father's counsel, but when asked about the funds at trial, Mother testified that she used $1,600 to pay for the medical bills related to the car accident, and $9,000 to repay her father for the loans used to pay her attorney's fees. Clearly, Mother used these funds as the parties agreed. Father does not suggest that the medical bills or loans to Mother's father were unpaid. The remaining balance of the settlement was about $2,400, but the Mediated Agreement did not address any remaining funds. Mother's bank records indicated that at the time when the $13,000 settlement was deposited into her checking account, she was overdrawn by about $1,000. By the end of that same month, her account balance was back down to $355.

Father's argument with regard to this issue is somewhat hard to follow. He ends his discussion of the settlement with a request "that the decision of the trial court be reversed." Going back to the original issue presented, we find no inconsistency between the Mediated Agreement and the final decree of divorce. It is undisputed that Mother used the funds for

_____

[10] Despite our approval of this unique approach in this case because of the parties' rare circumstances, we wish to emphasize to the trial courts that this approach should be used sparingly and only under the most unique factual scenarios. *See Walton*, 2005 WL 1922565, at *6 n.2; *Isbell*, 1999 WL 455429, at *5.

her medical bills and to repay her father, as agreed. Therefore, we find that Father is not entitled to relief with respect to this issue.

### B.    Attorney's Fees

In the trial court, Mother sought an award of her attorney's fees in the amount of approximately $24,000. The trial court ordered Father to pay $5,000 of Mother's attorney's fees. Father argues on appeal that the trial court made contradictory findings with regard to the issue of attorney's fees. The court's letter ruling stated:

> Wife has requested an award of attorney's fees. Wife presented evidence of the amount of attorney's fees that she has incurred in this case. The Court has reviewed the Affidavit of Wife's counsel and also the amounts that Wife has already paid. In light of the assets in this case, and the amount of fees incurred by Wife, the Court is unable to approve Wife's request, although it appears that Wife's counsel has done an excellent job in their representation.
>
> However, the Court does feel that the Husband should pay a portion of the Wife's fees considering the factors that deal with alimony in this case, particularly Husband's fault in the breakdown of the marriage, Wife's need, and Husband's denial of adultery in the pleadings filed with this Court. Therefore, Wife is awarded the sum of $5,000.00 as alimony in solido representing an award to partially defray Wife's attorney's fees.

Father claims that it was contradictory for the trial court to first say that it could not award fees in light of the assets in this case, and then to nonetheless make an award. Reading the entire section of the letter ruling in context, we find it clear that the trial court's initial statement that the court was "unable to approve Wife's request," in light of the assets "and the amount of fees incurred by Wife," was the trial court's explanation for why it decided not grant the *full* amount of attorney's fees requested. Then, the court explained that it was awarding a portion of Mother's attorney's fees, considering Mother's need, Father's fault in the breakdown of the marriage, and the fact that Father filed an answer denying that he had committed adultery. With regard to the alleged grounds for divorce, Mother presented the testimony of the husband of Father's paramour, who had discovered his wife and Father in bed together. Mother testified that Father had admitted to the affair before she filed the complaint for divorce. Father and his paramour later testified and admitted to having a sexual relationship. Considering all the circumstances, we find no error in the trial court's decision to award Mother $5,000 of her attorney's fees.

Mother has requested an award of attorney's fees on appeal pursuant to Tennessee Code Annotated section 36-5-103(c). Because both parties were partially successful on

appeal, Mother earns substantially more money than Father, and Father has no ability to pay,[11] we respectfully decline to make an award of attorney's fees on appeal.

## V.  CONCLUSION


For the aforementioned reasons, the decision of the circuit court is hereby affirmed in part, as modified, and reversed in part, and this cause is remanded for further proceedings to include a calculation of Father's child support obligation.  Costs of this appeal are taxed to the appellant, James Gerald Vinson, and his surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.

---

[11]  Of Father's current net income of roughly $2,000 per month, he is paying $694 in child support and around $1104 for the bankruptcy payment.